UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JASON MICHAEL BECK,

       Plaintiff,                      Civil Action No. 12-11067

      v.                          District Judge Paul D. Borman
                                  Magistrate Judge Laurie J. Michelson

COMMISSIONER OF
SOCIAL SECURITY,

       Defendant.
_____/

**REPORT AND RECOMMENDATION TO
GRANT IN PART PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [9] AND
DENY DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [13]**

Plaintiff Jason Beck appeals Defendant Commissioner of Social Security's denial of his applications for disability insurance benefits and supplemental security income. (*See* Dkt. 1, Compl.; Tr. 12.) Before the Court for a Report and Recommendation (Dkt. 3) are the parties' cross-motions for summary judgment (Dkts. 9, 13; *see also* Dkt. 14). For the reasons set forth below, this Court finds that the ALJ did not adequately explain how he accounted for an examining physician's opinion, and, without further articulation, the Court cannot accurately determine whether substantial evidence supports the ALJ's decision. The Court therefore RECOMMENDS that Plaintiff's Motion for Summary Judgment (Dkt. 9) be GRANTED IN PART, that Defendant's Motion for Summary Judgment (Dkt. 13) be DENIED, and that, pursuant to 42 U.S.C. § 405(g), the decision of the Commissioner of Social Security be REMANDED.

## I. BACKGROUND

Mr. Beck was 30 years old on the date he alleges he became disabled.  (*See* Tr. 12, 127.)
He has an eleventh-grade education.  (Tr. 29.)  Prior to the alleged disability onset date, Plaintiff
worked as a cook at a fast-food restaurant and as a laborer at a supermarket distribution center.  (Tr.
29-30.)  On April 2, 2009, Plaintiff suffered a heart-attack; he asserts that chest pain and fatigue, as
well as depression and anxiety, have prevented him from working since that date.  (*See* Tr. 35, 39.)

### A.  Procedural History

On August 14, 2009, Plaintiff applied for disability insurance benefits ("DIB") and
supplemental security income ("SSI") asserting that he became unable to work on April 2, 2009.
(Tr. 12.)  The Commissioner initially denied these applications on October 19, 2009.  (Tr. 12.)
Plaintiff then requested an administrative hearing, and on May 12, 2011, he appeared with counsel
before Administrative Law Judge Michael McGuire, who considered his case *de novo*.  (*See* Tr. 12-
19, 24-44.)  In a July 25, 2011 decision, the ALJ found that Plaintiff was not disabled.  (*See* Tr. 12-
19.)  The ALJ's decision became the final decision of the Commissioner on January 10, 2012 when
the Social Security Administration's Appeals Council denied Plaintiff's request for review.  (Tr. 1.)
Plaintiff filed this suit on March 9, 2012.  (Dkt. 1, Compl.)

### B.  Medical Evidence

#### 1.  *Plaintiff's Physical Impairments*

While watching television on the evening of April 2, 2009, Mr. Beck suddenly experienced
chest discomfort.  (Tr. 273.)  When the feeling persisted, Plaintiff went to the emergency room.  (*Id.*)
The emergency-room staff determined that Plaintiff had an acute, inferior wall myocardial
infraction.  (Tr. 226.)  They gave Plaintiff thrombolytics and transferred him to a hospital in Toledo,

2

Ohio.  (Tr. 226.)

The next day, April 3, 2009, Dr. James Bingle saw Plaintiff at the hospital.  (Tr. 226-27.)

Beck reported that he still had some chest discomfort.  (Tr. 226.)  Dr. Bingle noted that Plaintiff was

a smoker and had smoked marijuana the day before; he remarked, "Needs to quit this obviously."

(Tr. 227.)  Dr. Bingle arranged for a catheterization.  (Tr. 227.)  It showed mild plaque in Beck's

right coronary artery and mild inferior hypokinesis.  (Tr. 249; *see also* Tr. 273.)  It also revealed,

however, that Beck's other coronary arteries and ejection fraction were normal.  (Tr. 273.)

Plaintiff was discharged from the hospital on April 5, 2009.  (Tr. 273.)  At discharge, Dr.

Bingle reported, "It is my opinion that he had likely ruptured the plaque and [it] sealed . . . over by

the time we evaluate[d] him.  He had smoked marijuana that day and does smoke cigarettes;

question of relationship of these is unknown."  (Tr. 273.)  Dr. Bingle prescribed a number of

medications while noting that "we should treat him as [we] would any other myocardial infarction."

(*Id.*)  Dr. Bingle also recommended that Plaintiff stop using marijuana.  (*Id.*)

Later in April 2009, Beck saw Dr. Laura DeBenedetti.  (Tr. 275-79.)  Plaintiff reported that

he was doing well; he had no complaints of chest pain, shortness of breath, lightheadedness, or

dizziness.  (Tr. 275.)  Dr. DeBenedetti decreased the dosage of one of Plaintiff's medications but

continued the others.  (*Id.*)  She spoke with Beck about smoking; Plaintiff indicated that he was

working on quitting.  (*Id.*)  Dr. DeBenedetti scheduled an echocardiogram for six to eight weeks.

(*Id.*)

The echocardiogram was taken on June 2, 2009.  (Tr. 280, 318.)  It revealed that Beck's left-

ventricular function was mildly reduced, with an ejection fraction of 50-55%.  (Tr. 280.)  "A normal

[left ventricular ejection fraction] ranges from 55-70%."  Cleveland Clinic, *Understanding Your*

*Ejection Fraction* (Dec. 2011), http://my.clevelandclinic.org/heart/disorders/heartfailure/ ejectionfraction.aspx.

A few days later, on June 5, 2010, Plaintiff returned to Dr. Bingle. (Tr. 283-85.) Dr. Bingle noted, "Mr. Beck is doing well. He does have some chest discomfort, significant enough, but he feels he may well be disabled from it." (Tr. 283.) Plaintiff's chest discomfort was reported as "intermittent and not related to activity." (*Id.*) Dr. Bingle did not believe that Plaintiff's chest pain was "anginal" and remarked, "[i]t is quite a bit difficult to sort this out." (Tr. 285.) Having already discussed tobacco use with Plaintiff "multiple times," Dr. Bingle again noted, "He needs to stop totally. He is aware of this." (*Id.*) Dr. Bingle's impression was, "[c]oronary artery disease; stable situation." (*Id.*) Dr. Bingle ordered a stress echocardiogram. (*Id.*)

On June 10, 2009, Plaintiff underwent the stress echocardiogram. (Tr. 315-16 ; Tr. 365-66.) The exercise protocol was stopped after 13 minutes because Beck experienced shortness of breath, fatigue, and dizziness. (Tr. 315.) The echocardiogram taken immediately after exercise revealed no abnormalities. (*Id.*)

In September 2009, Plaintiff returned to the emergency room with chest pain. (Tr. 292-93, 302; *see also* Tr. 289-91, 295-301, 302-05.) A chest x-ray showed that Plaintiff's lungs were hyperinflated. (Tr. 302.) It appears, however, that Beck's chest pain subsided relatively quickly, and, despite a recommendation of admission, Plaintiff said he felt fine and did not want to stay in the hospital. (Tr. 293.)

The record reflects that Plaintiff did not again report chest pain until early November 2010. (Tr. 326-29; *see also* Tr. 331-39.) Dr. John Letcher noted,

> [Mr. Beck] continues to have ill-defined chest discomfort not associated with exertion three times a week. He takes one

4

> nitroglycerin [tablet?] each time and has an improvement.  It is very
> atypical in nature, but sometimes [it] radiates to his neck and causes
> diaphoresis.  It has been continuous for the last year since [his] last
> visit here.

(Tr. 326.)  Dr. Letcher suggested, among other things, that Plaintiff stop smoking and "lay off the

nitroglycerin intake."  (*Id.*)  He scheduled a follow-up exam for six months.  (*Id.*)

In February 2011, Dr. Tanvir Qureshi evaluated Plaintiff for Michigan's Disability

Determination Service.  (Tr. 340-50.)  Plaintiff reported sharp chest pain that radiated to the shoulder

and neck area lasting five to ten minutes.  (Tr. 341.)  Plaintiff told Dr. Qureshi that the pain was not

related to any activity and that nitroglycerin relieved the pain.  (*Id.*)  Dr. Qureshi performed an

electrocardiogram; it showed that Beck's sinus rhythm was normal and no "acute STT wave

changes."  (Tr. 342.)  Dr. Qureshi's impression was "[h]istory of myocardial infarction" and "[n]on-

obstructive coronary disease."  (Tr. 342.)

Dr. Qureshi also completed a "Medical Source Statement of Ability To Do Work-Related

Activities (Physical)" form.  (Tr. 343-48.)  He indicated that Plaintiff could sit for up to four hours

at a time, stand for up to two hours at a time, and walk for up to two hours at a time.  (Tr. 344.)  Dr.

Qureshi also concluded that Plaintiff could sit for five hours, stand for two hours, and walk for one

hour in an eight-hour workday.  (Tr. 344.)  He further found that Plaintiff could lift and carry 51-100

pounds "occasionally."  (Tr. 343.)  Among the listed activities of daily living (which included

shopping, traveling, preparing simple meals, and sorting handling or using paper or files) Dr.

Qureshi indicated that Plaintiff had no limitations.  (Tr. 348.)

On May 25, 2011, Beck, by way of providing background information to a psychiatrist,

reported that he was still having chest pains two to three times per week and that he had gone to the

emergency room recently.  (Tr. 390.)  Plaintiff was still smoking a half pack per day.  (*Id.*)  He said

5

he had not used marijuana for three-and-a-half years, however.  (*Id.*)

### 2. *Plaintiff's Mental Impairments*

On February 22, 2011, Dr. Gayle Oliver-Brannon, a limited licensed psychologist, completed a psychological evaluation of Plaintiff for Michigan's Disability Determination Service.  (Tr. 353-56.)  (Dr. James Day, a licensed psychologist, reviewed Dr. Oliver-Brannon's evaluation.)  Plaintiff reported that he had anxiety and depression "off and on," that he isolated himself "a lot" when he did not feel good physically or when he did not feel good about himself, and that his appetite had decreased due to depression (Plaintiff, who is 6' 2" tall, then weighed 152 pounds).  (Tr. 353.)  Plaintiff further provided that he had a supportive family and a couple of friends and that he enjoyed playing cards, watching movies, and reading.  (Tr. 353.)

Dr. Oliver-Brannon noted that Plaintiff was irritable and short tempered.  (*Id.*)  She also found that Plaintiff had a "[l]ow mood and self esteem with poor concentration."  (Tr. 354.)  Plaintiff's immediate, recent, and remote memory were intact, however.  (Tr. 355.)  On standardized testing, Plaintiff's full-scale IQ was at the 47th percentile but his processing speed was at only the 14th percentile, i.e., low average.  (Tr. 357.)  Dr. Oliver-Brannon diagnosed dysthymic disorder with a Global Assessment Functioning score of 52.  (Tr. 355.)[1]  She deemed Plaintiff's prognosis "[s]erious: [t]he claimant should be evaluated for psychoactive medications, counseling or

---

[1]A GAF score is a subjective determination that represents "the clinician's judgment of the individual's overall level of functioning."  American Psychiatric Assoc., *Diagnostic and Statistical Manual of Mental Disorders* ("*DSM-IV*"), 30-34 (4th ed., Text Revision 2000).  It ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, persistent inability to maintain minimal personal hygiene, or serious suicidal act with clear expectation of death).  *Id.* at 32.

A GAF of 51 to 60 corresponds to "moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)."  *DSM–IV* at 34.

psychotherapy to treat mood issues." (Tr. 356.) She suggested that "[Mr. Beck] is able to understand and engage simple to moderate everyday tasks. However[,] it is suspected [that] due to physical limitations and mental health issues the claimant may decompensate if pressured into employment at this time." (Tr. 356.)

Dr. Oliver-Brannon also completed a "Medical Source Statement of Ability To Do Work-Related Activities (Mental)" form. (Tr. 362-64.) The form provided, "Please assist us in determining this individual's ability to do work-related activities on a sustained basis. 'Sustained basis' means the ability to perform work-related activities eight hours a day for five days a week, or an equivalent work schedule." (Tr. 362.) She provided that Plaintiff had no limitations in understanding, remembering, and carrying out simple instructions and was not limited in making judgments on simple work-related decisions. (*Id.*) She indicated, however, that Plaintiff was markedly limited in his ability to carry out complex instructions. (*Id.*)

Because of Dr. Oliver-Brannon's evaluation, Plaintiff began mental-health treatment in April 2011. (Tr. 35.) Jennifer Bennion completed the initial intake. (Tr. 367-78.) Beck told Ms. Bennion he felt depressed, anxious, hopeless, stressed, alone and out of place. (Tr. 370.) He also reported often feeling angry and irritable. (*Id.*) Plaintiff also told Bennion that he often felt lightheaded and fatigued. (*Id.*) It was Bennion's impression that "[Mr. Beck] struggles with interpersonal relationships and acceptance of self." (Tr. 370.) She provided,

> [Mr. Beck's] history of and presenting symptomatology is consistent with a diagnosis of Depressive Disorder [not otherwise specified ("NOS")], Alcohol Abuse-Full Remission and Personality Disorder NOS. His symptoms have reportedly been present for six consecutive months in a twelve month period and have currently resulted in substantial functional impairments in his daily life as evidenced by difficulties with self direction, learning and recreation and interpersonal relationships.

7

(Tr. 377.)  She assigned a GAF score of 50.  (Tr. 375.)[2]

The record contains three mental-health progress notes from May 2011.  On May 5, 2011, Plaintiff presented as "mildly dysphoric, expressing a wide [range] of affect, talkative, [responsive], and cooperative."  (Tr. 379.)  On May 16, 2011, Plaintiff told his therapist or counselor, "I have social anxiety in situations where there are people that I don't know."  (Tr. 382.)  The counselor noted that Plaintiff presented as "mostly euthymic."  (*Id.*)  On May 26, 2011, Plaintiff presented as "mildly dysphoric, flat in affect, guarded, talkative, responsive, and cooperative."  (Tr. 385.)

On May 25, 2011, Plaintiff underwent an evaluation with Dr. Nancy Hanke, a psychiatrist.  (Tr. 388-94.)  She found that Plaintiff's manner was cooperative, but also anxious, reserved, and guarded.  (Tr. 391.)  She noted that Beck's mood was sad and anxious.  (*Id.*)  Dr. Hanke noted that Plaintiff "appears to have suppressed and/or repressed his emotional life to the point where he has had a heart attack at a young age."  (Tr. 393.)  She assigned Plaintiff a GAF score of 40, and prescribed Buspar for Plaintiff's anxiety and depression.  (Tr. 389, 393.)[3]

---

[2]A GAF score of 45 to 50 reflects "serious symptoms (e.g. suicidal ideation, severe obsession rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)."  *DSM-IV* at 34.

[3]A GAF score of 31 to 40 reflects "[s]ome impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood  (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school)."  *DSM-IV* at 34.

### C.  Testimony at the Hearing Before the ALJ

#### 1. *Plaintiff's Testimony*

At the May 2011 administrative hearing before ALJ McGuire, Plaintiff testified about his chest pain, fatigue, and depression.  Beck stated that he had chest pain about "two to four times a week," which nitroglycerine relieved "[a]lmost every time." (Tr. 31.)  Plaintiff reported that, while nitroglycerine would usually relieve the pain within "five to ten minutes," he "would usually need about another 20 to 30 minutes to recover before [trying to] do anything again." (Tr. 40.)  When asked whether a doctor had determined the cause of his chest pain, Plaintiff responded, "[my doctor's] not exactly sure" but "as far as speculation, he thinks that it may be sort of due to the fact that I'm still trying to quit, but unable to quit smoking cigarettes." (Tr. 31.)  Beck said that he had, however, reduced his smoking from one pack per day down to a half pack per day, and that he had set a new deadline for quitting entirely.  (Tr. 32.)

Plaintiff testified that his heart problems caused fatigue.  (Tr. 32.)  "I seem to have lots of fatigue.  I can't really walk more than a few blocks at a time." (*Id.*)  Plaintiff also said that his fatigue limited standing to about 20 to 30 minutes at a time.  (Tr. 33.)  And it caused him "to take almost daily naps in the afternoon." (*Id.*)  Plaintiff said he could lift about 20 to 25 pounds once and, while expressing uncertainty, about a pound-and-a-half repetitively (e.g., dishes).  (*Id.*)  He explained, "if I'm standing doing dishes, for some, sometimes for no reason and no explanation at all, I get sweaty, tired.  I feel the need that I have to sit down [immediately] or I'm going to fall over[;] and I have fallen over before.  I mean, I don't have a reason for it, it just happens." (Tr. 34.)

Plaintiff testified that he had only recently started mental-health treatment.  (Tr. 34-35.)  Plaintiff described his mental-health as follows: "I feel almost useless, hopeless.  I feel like I

shouldn't really try and attempt anything because I'm never going to be able to do it, but I know it's not true, but I just feel that way." (Tr. 35.) He additionally reported being depressed about his inability to work: "I'm 32 years old. I still feel I have something left to do with my life. But at this point and time, I just can't." (*Id.*)

In terms of activities of daily living, Plaintiff said that he reads the newspaper and books, watches movies or the morning talk show, or works on crossword puzzles. (Tr. 37.) Plaintiff also said that he "tr[ies] to go to the library as much as I can." (Tr. 37.) He also stated that he watched the television show "Jeopardy," including winning a couple of times ("[u]sually Teen Jeopardy"). (Tr. 38.)

### 2. *The Vocational Expert's Testimony*

The ALJ solicited testimony from a vocational expert ("VE") to determine whether jobs would be available for hypothetical individuals with varying functional limitations. The VE offered testimony about job availability for a hypothetical individual of Plaintiff's age, education, and work experience who was capable of standing, walking, or sitting for six hours in an eight-hour day, pushing or pulling 20 pounds, and engaging in postural activities occasionally; the individual, however, had to avoid temperature extremes. (Tr. 41.) The VE testified that the hypothetical person could perform three "light, unskilled[,] [Dictionary of Occupational Titles Specific Vocational Preparation] 2" jobs: mailroom clerk, information clerk, and office helper. (Tr. 41.) According to the VE, there were 3,200, 18,500, and 3,700 such jobs in Michigan, respectively. (*Id.*)

## II.  THE ADMINISTRATIVE LAW JUDGE'S FINDINGS

Under the Social Security Act (the "Act"), Disability Insurance Benefits (for qualifying wage earners who become disabled prior to expiration of their insured status) and Supplemental Security Income "are available only for those who have a 'disability.'" *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007).  The Act defines "disability," in relevant part, as the:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI).

The Social Security regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> Step One: If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.

> Step Two: If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.

> Step Three: If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.

> Step Four: If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

> Step Five: Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

*See* 20 C.F.R. §§ 404.1520, 416.920; *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001).  "The burden of proof is on the claimant throughout the first four steps . . . .  If the

analysis reaches the fifth step without a finding that the claimant is not disabled, the burden transfers to the [Commissioner]." *Preslar v. Sec'y of Health and Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

At step one, ALJ McGuire found that Plaintiff had not engaged in substantial gainful activity since the alleged disability onset date of April 2, 2009. (Tr. 14.) At step two, he found that Plaintiff had the following severe impairments: non-obstructive coronary artery disease and is status post myocardial infarction with a normal left ventricle ejection fraction. (*Id.*) Next, the ALJ concluded that none of these impairments, alone or in combination, met or medically equaled a listed impairment. (Tr. 15-16.) Between steps three and four, the ALJ determined that Plaintiff had the residual functional capacity to perform "light work as defined in 20 CFR 404.1567(b) and 416.967(b) except that the claimant is only capable of performing postural activities on occasion and must avoid temperature extremes." (Tr. 16.) At step four, the ALJ found that Plaintiff was unable to perform any past relevant work. (Tr. 18.) At step five, the ALJ found that sufficient jobs existed in the national economy for someone of Plaintiff's age, education, work experience, and residual functional capacity. (Tr. 18-19.) The ALJ therefore concluded that Plaintiff was not disabled as defined by the Social Security Act. (Tr. 19.)

## III. STANDARD OF REVIEW

This Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). Judicial review under this statute is limited: the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal quotation

marks omitted).  Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted).  In deciding whether substantial evidence supports the ALJ's decision, this Court does "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.").

When reviewing the Commissioner's factual findings for substantial evidence, the Court is limited to an examination of the record and must consider that record as a whole. *Bass*, 499 F.3d at 512-13; *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992).  The Court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council." *Heston*, 245 F.3d at 535.  There is no requirement, however, that either the ALJ or this Court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party." (internal quotation marks omitted)).  If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted); *see also Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (en banc) (noting that the substantial evidence standard "presupposes . . . a zone of choice within which the decisionmakers can go either way, without

13

interference by The Courts" (internal quotation marks omitted)).

## IV. ANALYSIS

Although not clearly demarcated, Plaintiff appears to raise three claims of error on appeal. He says that the ALJ erred at step two of the five-step disability determination: "Despite the findings of the mental limitations, the ALJ substituted his judgment that the mental impairments would not cause more than minimal limitations."  (Dkt. 9, Pl.'s Mot. Summ. J. at 6; Pl.'s Resp. to Defs.' Mot. Summ. J. at 2.)  Plaintiff also asserts that the ALJ erred by not specifying how much weight he gave Dr. Qureshi's opinion or by misinterpreting that opinion.  (Pl.'s Mot. Summ. J. at 6-7; Pl.'s Resp. to Defs.' Mot. Summ. J. at 3.)  Third, Plaintiff says that the ALJ erred in assessing his credibility, including his testimony about the effects of his fatigue.  (Pl.'s Mot. Summ. J. at 7-8.)

Because it is a threshold issue, the Court considers Plaintiff's step-two argument first.  The Court then addresses Plaintiff's argument about Dr. Qureshi's opinion.  That claim of error warrants remand, and given its potential impact on the ALJ's credibility determination, the Court forgoes fully addressing Plaintiff's third claim of error.

### A.  Plaintiff Has Not Shown that the ALJ Committed Harmful Error at Step Two

At step two of the five-step disability process, an ALJ is to apply a "special technique" for evaluating the severity of a mental impairment.  20 C.F.R. § 404.1520a(a).  In *Rabbers v. Comm'r Soc. Sec. Admin.*, the Sixth Circuit summarized that technique as follows:

> At step two, an ALJ must evaluate the claimant's "symptoms, signs, and laboratory findings" to determine whether the claimant has a "medically determinable mental impairment(s)." [20 C.F.R.] § 404.1520a(b)(1).  If the claimant has a medically determinable mental impairment, the ALJ "must then rate the degree of functional limitation resulting from the impairment(s)" with respect to "four broad functional areas": "[a]ctivities of daily living; social functioning; concentration, persistence, or pace; and episodes of

> decompensation." *Id.* §§ 404.1520a(b)(2), (c)(3). These four
> functional areas are commonly known as the "B criteria." *See* 20
> C.F.R. pt. 404, subpt. P, app. 1, § 12.00 et seq.; *Craft v. Astrue*, 539
> F.3d 668, 674 (7th Cir. 2008). The degree of limitation in the first
> three functional areas is rated using the following five-point scale:
> none, mild, moderate, marked, and extreme. 20 C.F.R. §
> 404.1520a(c)(4). The degree of limitation in the fourth functional
> area (episodes of decompensation) is rated using the following
> four-point scale: none, one or two, three, four or more. *Id.* If the
> ALJ rates the first three functional areas as "none" or "mild" and the
> fourth area as "none," the impairment is generally not considered
> severe and the claimant is conclusively not disabled. *Id.* §
> 404.1520a(d)(1). Otherwise, the impairment is considered severe and
> the ALJ will proceed to step three. *See id.* § 404.1520a(d)(2).

582 F.3d 647, 652-53 (6th Cir. 2009). In this case, ALJ McGuire applied the above "special technique." (Tr. 14-15.) And the Court believes that his "mild" ratings in the three functional areas — activities of daily living, social functioning, and concentration, persistence, or pace — are supported by substantial evidence.

First, the ALJ reasonably concluded that Plaintiff was only mildly limited in activities of daily living. (Tr. 15.) As the ALJ noted, Plaintiff himself reported that he had no problems with personal care. (Tr. 15, 164.) The ALJ also correctly found that Plaintiff reported doing some chores around the house, which includes dishes for 20-30 minutes and laundry for two to two-and-half hours. (Tr. 15, 38, 165.) Further, as the ALJ noted, Plaintiff testified that he went to the library "as much as [he could]." (Tr. 15, 38.) Although raised in a different context, the ALJ also noted that Plaintiff did crossword puzzles on a daily basis, watched movies, enjoyed reading, and sometimes played cards. (Tr. 15, 37-39.) These findings by the ALJ substantially support his "mild" rating in this B criteria.

The ALJ also reasonably found that Plaintiff was only mildly limited in social functioning. (Tr. 15.) The ALJ correctly found that Plaintiff has friends who visit and who he plays cards with.

15

(Tr. 15, 38.)  In fact, Plaintiff said that one of his friends came over "quite a bit" and that he and his friend would "sit and watch news programs and discuss them as they're going on."  (Tr. 38.) Further, as the ALJ indicated, although Plaintiff said he avoided going out of his way to talk to people, he also testified that he was "pretty okay with people" and that people "generally" liked him. (Tr. 15, 37.)  The foregoing is substantial evidence supporting the ALJ's mild rating in social functioning.

Third, the ALJ found that Plaintiff had "mild" limitations in concentration, persistence, or pace. This too was reasonable.  The ALJ justifiably relied on the fact that Plaintiff does crossword puzzles on a daily basis, enjoyed reading, and went to the library as often as he could.  (Tr. 15, 37-39.)  The Court adds that Plaintiff played along with the T.V. show "Jeopardy" and said he beat the contestants a couple of times.  (Tr. 38.)  Further, Plaintiff's self-completed function report provides that he can pay attention for "as long as it takes to finish a task" and that he can follow written and spoken instructions "very well."  (Tr. 168.)  Thus, substantial evidence also supports the ALJ's mild limitation rating in concentration, persistence, or pace.

Given that the ALJ reasonably found that Plaintiff had "mild" limitations in the three functional areas of the B criteria, it follows that the ALJ's conclusion that Plaintiff's mental limitations were not severe is also supported by substantial evidence.  The ALJ stated,

> The claimant's medically determinable mental impairments of dysthymic disorder, depressive disorder, not otherwise specified, and a personality disorder, not otherwise specified [do] not cause more than [a] minimal limitation in the claimant's ability to perform basic mental work activities and is therefore nonsevere.

(Tr. 14-15.)  This was the correct conclusion based on the governing regulations:

> If we rate the degree of your limitation in the first three functional areas as "none" or "mild" and "none" in the fourth area, we will

16

> generally conclude that your impairment(s) is not severe, unless the evidence otherwise indicates that there is more than a minimal limitation in your ability to do basic work activities (see [20 C.F.R.] § 404.1521).

20 C.F.R. § 404.1520a; *accord Rabbers*, 582 F.3d at 652-53.[4]

Plaintiff nonetheless maintains that a different step-two conclusion is warranted. Perhaps implicitly relying on the "unless" clause in 20 C.F.R. § 404.1520a, Plaintiff argues that the ALJ did not account for his low GAF scores or Dr. Oliver-Brannon's assessment, and, when those are accounted for, substantial evidence does not support the ALJ's finding that Plaintiff's mental impairments were not severe. (Pl.'s Mot. Summ. J. at 5-6; Pl.'s Resp. to Defs.' Mot. Summ. J. at 2.)

It is true that Plaintiff received GAF scores of 52, 50, and 40. (Tr. 355, 375, 389.) And it is also true that these GAF scores indicate a range from "moderate" symptoms down to "[s]ome impairment in reality testing or communication . . . OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood." *DSM-IV* at 34. Thus, Plaintiff is correct that, based on these scores, the ALJ might have reasonably found more than "mild" limitations in one or more of the three B-criteria functional areas.

On the other hand, the case law does not require an ALJ to give great weight to GAF scores. "A GAF score may help an ALJ assess mental RFC, but it is not raw medical data." *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 503 n.7 (6th Cir. 2006). In particular, "according to the DSM's explanation of the GAF scale, a score may have little or no bearing on the subject's social and occupational functioning." *Id.* at 511; *see also DeBoard v. Comm'r of Soc. Sec.*, 211 F. App'x

---

[4]No one asserts that Plaintiff has had an episode of decompensation of extended duration.

411, 415 (6th Cir. 2006).  Further,

> GAF scores . . . are measures of both severity of symptoms *and*
> functional level.  [*Am. Psychiatric Ass'n, Diagnostic & Statistical
> Manual of Mental Disorders* 32 (Text Revision, 4th ed. 2000)].
> Because the "final GAF rating always reflects the worse of the two,"
> *id.* at 33, the score does not reflect the clinician's opinion of
> functional capacity.  Accordingly, "nowhere do the Social Security
> regulations or case law require an ALJ to determine the extent of an
> individual's disability based entirely on his GAF score."  *Wilkins v.
> Barnhart*, 69 Fed. Appx. 775, 780 (7th Cir. 2003) (citing *Howard v.
> Comm'r of Soc. Sec.*, 276 F.3d 235, 241 (6th Cir. 2002)).

*Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010); *see also Kornecky*, 167 F. App'x at 511 ("we

are not aware of any statutory, regulatory, or other authority requiring the ALJ to put stock in a GAF

score in the first place.").

Given the significant other evidence that the ALJ relied upon to rate the three function areas,

and that GAF scores are not particularly probative of a claimant's functioning, and that one of

Plaintiff's GAF scores indicated only "moderate" symptoms, the Court believes that substantial

evidence still supports the ALJ's ratings of Plaintiff's three functional areas even after the three

GAF scores are fully accounted for.  *See Kornecky*, 167 F. App'x at 511 (reasoning, where claimant

was assigned GAF scores of 40-45, 46, 50-55, and 52, "[i]f other substantial evidence (such as the

extent of the claimant's daily activities) supports the conclusion that [the claimant] is not disabled,

the court may not disturb the denial of benefits to a claimant whose GAF score is as low as [this

claimant's] or even lower.").

As for Dr. Oliver-Brannon's assessment, the Court agrees with Plaintiff that it was error for

the ALJ not to have discussed her opinion in his narrative.  But, as opposed to Dr. Qureshi's opinion

discussed below, it is not apparent how that error was harmful.  Plaintiff emphasizes that Dr. Oliver-

Brannon said, "it is suspected [that] due to physical limitations and mental health issues the claimant

may decompensate if pressured into employment at this time." (Tr. 356; *see* Pl.'s Mot. Summ. J. at 6.) That statement, however, is prefaced with "it is suspected"; it also uses the word "may." Dr. Oliver-Brannon therefore expressed considerable doubt about the consequences of working. Moreover, as the Commissioner argues, her suspicion was in part based on Plaintiff's physical limitations — an area where Dr. Oliver-Brannon, a psychologist, has no professional expertise.

Further, Dr. Oliver-Brannon completed a medical-source statement which tends to *support* the ALJ's step-two findings. As noted, the statement asks about Plaintiff's ability to perform tasks on a sustained basis, i.e., an eight-hour per day, five-days per week. (Tr. 362.) In completing the statement, Dr. Oliver-Brannon provided that Plaintiff had no limitations in understanding, remembering, and carrying out simple instructions, and that Plaintiff was not limited in making judgments on simple work-related decisions. (Tr. 362.) According to the applicable regulations, a mental impairment "is not severe if it does not significantly limit your . . . mental ability to do basic work activities" such as "[u]nderstanding, carrying out, and remembering simple instructions" and "use of judgment." 20 C.F.R. § 404.1521. Arguably then, Dr. Oliver-Brannon's medical-source statement indicates that Plaintiff was not significantly limited in his mental ability to do basic work activities, and, in turn, that his mental impairments were not severe.

In light of Dr. Oliver-Brannon's doubt about Plaintiff's ability to work, her medical-source statement which is arguably consistent with basic work, and the other evidence that the ALJ relied upon in rating the B criteria, the Court does not find that the ALJ's failure to discuss Dr. Oliver-Brannon's assessment warrants remand for further analysis at step two.[5]

---

[5]Plaintiff has made no argument that the ALJ erred with regard to his mental impairments in subsequent steps. The Court notes that the VE testified to unskilled jobs, and "[u]nskilled work is work which needs little or no judgment to do simple duties that can be learned on the job in a short

### B. Remand Is Warranted for the ALJ to Further Explain How Dr. Qureshi's Opinion Was Accounted For in the Disability Analysis

In addressing Dr. Qureshi's opinion, the ALJ stated,

> On February 14, 2011, Dr. Tanvir Qureshi, a state-hired consultative examiner, performed a physical examination of the claimant. Dr. Qureshi noted that the claimant had a history of a myocardial infarction and non-obstructive coronary artery disease. With respect to the claimant's chest pain, Dr. Qureshi noted that this pain is relieved with Nitroglycerin. He opined that the claimant was capable of performing all of his activities of daily living and lifting and/or carrying up to one hundred pounds, sitting for five hours, standing for two hours, walking for one hour, and performing postural activities on occasion (Exhibit 9F). This opinion is given weight to the extent that it is consistent with the other medical evidence of record.

(Tr. 17-18.) Plaintiff asserts that "[e]xactly how much weight this translates into and what other medical evidence it was consistent with is left for speculation." (Pl.'s Mot. Summ. J. at 6; *see also* Pl.'s Resp. to Def.'s Mot. Summ. J. at 3.)

The sitting/standing/walking limitations in Dr. Qureshi's opinion correlate to sedentary work. *See* S.S.R. 96-9p, 1996 WL 374185 at *6 (explaining that jobs "are sedentary if walking and standing are required occasionally and other sedentary criteria are met" and that "'[o]ccasionally' means occurring from very little up to one-third of the time, and would generally total no more than about 2 hours of an 8-hour workday. Sitting would generally total about 6 hours of an 8-hour workday.") But the ALJ found that Plaintiff had the residual functional capacity to perform more-demanding "light work." (Tr. 18.) It is unclear why the ALJ rejected Dr. Qureshi's opinion in this regard. The Court recognizes that Dr. Qureshi, who examined Plaintiff only once, was not a treating source. *See Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 876 (6th Cir. 2007) (explaining that

---

period of time." 20 C.F.R. § 404.1568(a).

opinions may come from non-examining, examining, or treating sources). And thus, Plaintiff was not deprived of a substantial procedural right by the ALJ's failure to assign a weight to Dr. Qureshi's opinion or detail which parts were rejected and why. *See Smith*, 482 F.3d at 876 ("[E]ven if the purpose of the reasons-giving requirement in [20 C.F.R.] § 404.1527(d)(2) applies to the entire regulation, the SSA requires ALJs to give reasons for only *treating* sources."); *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 656 (6th Cir. 2009) ("[I]f an agency has failed to adhere to its own procedures, we will not remand for further administrative proceedings unless the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses." (internal quotation marks and citation omitted)).

Nonetheless, an ALJ has a duty to provide an explanation sufficient for the Court to understand how the ALJ reached his disability determination. *See Lowery v. Comm'r of Soc. Sec.*, 55 F. App'x 333, 339 (6th Cir. 2003) ("'ALJ may not select and discuss only that evidence that favors his ultimate conclusion, but must articulate, at some minimum level, his analysis of the evidence to allow the appellate court to trace the path of his reasoning.'" (quoting *Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir. 1995))); *Pollaccia v. Comm'r of Soc. Sec.*, No. 09-cv-14438, 2011 WL 281044, at *6 (Jan. 6, 2011), *report and recommendation adopted by* 2011 WL 281037 (E.D. Mich. Jan. 25, 2011) ("'[A] court may not uphold an ALJ's decision, even if there is enough evidence in the record to support it, if the decision fails to provide an accurate and logical bridge between the evidence and the result.'" (quoting *Ramos v. Astrue*, 674 F. Supp. 2d 1076, 1080 (E.D. Wisc. 2009))); *Grandchamp v. Comm'r of Soc. Sec.*, No. 09-cv-10282, 2010 WL 1064144, at *10 (Jan. 25, 2010), *report and recommendation adopted in relevant part by* 2010 WL 1064138 (E.D. Mich. Mar. 22, 2010) ("'While the ALJ is not required to address every piece of evidence, he must articulate

21

some legitimate reason for his decision.  Most importantly he must build an accurate and logical

bridge from the evidence to his conclusion.'" (quoting *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir.

2000))).

Recently, the Sixth Circuit, in an unpublished opinion, held that an ALJ's narrative fell short

of the *Diaz* articulation requirement because it failed to explain how an examining physician's

opinion was weighed against the other evidence of record.  In *Stacey v. Comm'r of Soc. Sec.*, the

claimant injured his back at work which later required surgery to repair a herniated disc.  451 F.

App'x 517, 518 (6th Cir. 2011).   The ALJ found that Stacey could perform "light" work but an

examining physician, Dr. David Randolph, opined that Stacey was limited to "sedentary" work.  *Id.*

at 518-19.  The ALJ's narrative cited the examining physician's opinion when recounting Stacey's

medical history, but the ALJ ultimately favored the opinion of a non-examining, state-agency

physician, Dr. Jerry McCloud.  *Id.* at 519.  In doing so, the ALJ did not explain why he preferred

McCloud's non-examining opinion over Randolph's examining opinion.  *Id.*  The Sixth Circuit held

that this failure-to-articulate was error:

> ALJs must "evaluate every medical opinion [they] receive" by
> considering several enumerated factors, including the nature and
> length of the doctor's relationship with the claimant and whether the
> opinion is supported by medical evidence and consistent with the rest
> of the record. 20 C.F.R. § 404.1527(d).  When the opinion comes
> from a physician who treated the claimant, the ALJ must "give good
> reasons" in his written decision for the weight he assigns it. . . .
> Although this explanatory requirement does not apply to opinions
> from physicians who, like Dr. Randolph, have examined but not
> treated a claimant, *see Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504,
> 514 (6th Cir. 2010), the ALJ's decision still must say enough "to
> allow the appellate court to trace the path of his reasoning."  *Diaz v.
> Chater*, 55 F.3d 300, 307 (7th Cir.1995).
>
> The ALJ's decision falls short on this score.  We have no idea
> whether the ALJ (1) discounted Dr. Randolph's opinion for valid

22

reasons, (2) discounted Dr. Randolph's opinion for invalid reasons or (3) simply ignored Dr. Randolph's opinion altogether in reaching his conclusion that Stacey has the residual functional capacity to perform light work.  While the ALJ's failure to discuss the weight he assigned to Dr. Randolph's opinion might not have been error if the opinion concerned a peripheral issue or was merely cumulative of other evidence in the record, that is not the case here. Dr. Randolph provided one of three medical opinions that spoke to this key issue.

Making matters worse (or at least heightening the need for explanation) is that Dr. McCloud, whose opinion the ALJ accepted, apparently did not review Dr. Randolph's assessment of Stacey's physical capabilities in preparing his report. . . . [T]he ALJ does not indicate that he was even aware that Dr. McCloud never reviewed Dr. Randolph's assessment, much less that he had a valid reason for giving the most weight to Dr. McCloud's opinion of Stacey's physical capabilities.

*Stacey*, 451 F. App'x at 519-20; *see also Wilburn v. Astrue*, No. 3:10-CV-08, 2010 WL 6052397, at *6 (Sept. 13, 2010), *report and recommendation adopted by* 2011 WL 891022 (E.D. Tenn. Mar. 11, 2011) ("Though the opinions of examining physicians are not entitled to as great a weight as those of treating physicians, the ALJ must, nonetheless, explain the weight given to opinions of examining sources.").

Although the amount of explanation needed to address an examining-source opinion will vary from case to case, a number of factors lead this Court to conclude that the ALJ's explanation in this particular case is insufficient.  *Cf. Stacey*, 451 F. App'x at 519-20.  First, Dr. Qureshi's opinion was the only functional evaluation in the record authored by an "acceptable medical source." That fact alone warrants giving the opinion thorough consideration.  *See* S.S.R. 06-03p, 2006 WL 2329939, at *5 ("The fact that a medical opinion is from an 'acceptable medical source' is a factor that may justify giving that opinion greater weight than an opinion from a medical source who is not an 'acceptable medical source' because, as we previously indicated in the preamble to our

regulations at 65 FR 34955 , dated June 1, 2000, 'acceptable medical sources' 'are the most qualified health care professionals.'").

Second, Dr. Qureshi not only examined Plaintiff, but also reviewed Plaintiff's medical records. (Tr. 340). This also lends weight to his opinion. 20 C.F.R. § 404.1527(c)(6) ("[T]he extent to which an acceptable medical source is familiar with the other information in your case record [is a] relevant factor[] that we will consider in deciding the weight to give to a medical opinion.").

Third, Dr. Qureshi was a state-agency consultant, which, as the Administration itself asserts, "are highly qualified physicians and psychologists who are experts in the evaluation of the medical issues in disability claims under the Act." S.S.R. 96-6p, 1996 WL 374180, at *2; *see also* 20 C.F.R. § 404.1527(c)(6).

Fourth, the ALJ did not assign a weight to Dr. Qureshi's opinion. Instead, he merely stated that the physician's opinion was "given weight to the extent that it is consistent with the other medical evidence of record." (Tr. 18.) But Plaintiff's medical records are not so one-sided as to make plain why Dr. Qureshi's opinion should be rejected. For example, Plaintiff's mixed self-reports of "doing well" but having significant chest discomfort that he thought might be disabling (Tr. 283), and a normal stress echocardiogram but stopping exercise at 13 minutes because of shortness of breath, fatigue, and dizziness (Tr. 315), do not make apparent why Dr. Qureshi's finding that Plaintiff could only sit for five hours, stand for two hours, and walk for one hour in an eight-hour workday (Tr. 344) should be rejected.

Finally, the ALJ's error is not readily deemed harmless because the VE offered no testimony about someone limited to sedentary, as opposed to light, work.

Accordingly, for at least these five reasons, remand is justified.

The Commissioner concedes that the ALJ did not "directly state[]" why, despite Dr. Qureshi's opinion, he found that Plaintiff could perform the walking and standing requirements of light work, but argues that remand is not warranted because an explanation exists for the difference in opinion.  (Def.'s Mot. Summ. J. at 15.)  In particular, the Commissioner explains,

> the difference between the ALJ's finding and Dr. Qureshi's opinion could reasonably be attributed to the ALJ's assessment of Plaintiff's fatigue (Tr. 17).  Plaintiff associated his difficulty walking with his allegedly debilitating fatigue, but the ALJ found his complaints of fatigue not credible (Tr. 17, 32).  Although not as detailed as Plaintiff may have preferred, the ALJ's discussion of Dr. Qureshi's opinion was sufficient.

(*Id.*)

While it is possible that the ALJ accounted for Dr. Qureshi's opinion in the manner suggested by the Commissioner, it remains that no one (except the ALJ) can be sure.  And that is the point: this Court reviews the *ALJ's* findings for substantial evidence, and the ALJ did not make the necessary findings regarding a critical piece of evidence.  As well-stated by another court,

> [R]eviewing courts properly are alert to attempts by the Commissioner to deal for the first time in the brief with an issue completely ignored by the ALJ, or with a ground for the decision that was not asserted by the ALJ.  In such situations, courts correctly find that the late addition of an issue never addressed in the ALJ's opinion, or of a post-hearing articulation of grounds for a decision not found in the decision itself, are improper precisely because they deny the reviewing court a meaningful opportunity to review the decision itself, since the matter has become defined by what occurred after and outside of the decision.
>
> But, this legitimate focus on the need for meaningful review is not present in arguments that claim any reference by the Commissioner in his brief to evidence supporting a decision that was not specifically highlighted in the opinion is necessarily an impermissible "post-hoc rationalization."  Fundamentally, an ALJ must "give some indication" of the evidence on which he is relying and must also "mention or refute" evidence to the contrary, thereby, in the case of

25

> medical source opinion evidence, giving a reviewable explanation for
> why the opinion was not adopted.  Once having done so, the
> Commissioner is not precluded from further developing the
> "indication" given by the ALJ as to the evidence he relied upon, or
> more fully detailing the contrary evidence that was "mentioned" by
> the ALJ, so long as those actions by the Commissioner are consonant
> with, and do not substitute for, the stated explanation for the decision
> given by the ALJ in the opinion.

*Wells v. Comm'r of Soc. Sec.*, No. 3:11-CV-150, 2012 WL 1096135, at *3 (N.D. Ohio Mar. 30,

2012) (internal citations omitted).  In this case, the ALJ did not give "a reviewable explanation for

why [Dr. Qureshi's] opinion was not adopted," the Commissioner's argument is a "substitute for"

the ALJ's explanation, and, accordingly, does not alter the Court's recommendation to remand.

### C.  Plaintiff's Claim that the ALJ Erred in Assessing His Credibility Is Moot In View of this Court's Recommendation to Remand

Plaintiff also argues that the ALJ erred in discounting his testimony about fatigue or

otherwise discounting his credibility.  (Pl.'s Mot. Summ. J. at 7-9.)  This claim of error is moot in

view of the Court's recommendation to remand for further consideration of Dr. Qureshi's opinion:

if Dr. Qureshi's findings are credited on remand, those findings (e.g., that Plaintiff could not perform

"light" work) may lend new support to Plaintiff's alleged functional limitations (e.g., the effects of

his fatigue).

The Court, however, does make one additional finding in order to streamline the proceedings

on remand.  Plaintiff argues that in drawing an adverse inference from his decision to continue

smoking (Tr. 17), the ALJ did not comply with S.S.R. 82-59.  (Pl.'s Mot. Summ. J. at 7.)  That

ruling provides,

> An individual who would otherwise be found to be under a disability,
> but who fails without justifiable cause to follow treatment prescribed
> by a treating source which the Social Security Administration (SSA)
> determines can be expected to restore the individual's ability to work,

26

cannot by virtue of such 'failure' be found to be under a disability.

S.S.R. 82-59, 1982 WL 31384, at *1.  Plaintiff says that in this case, "there is not evidence that capacity to engage in [substantial gainful activity] would be restored if somking cessation had been followed."  (Pl.'s Mot. Summ. J. at 7.)  But a review of the ALJ's opinion suggests that he did not find that Plaintiff would be able to work if he stopped smoking.  Rather, the ALJ suggested that Plaintiff's testimony about the severity of his fatigue and chest pain was not entirely credible because, among other reasons, he continued to smoke despite the alleged symptoms.  (*See* Tr. 17.) Accordingly, the ALJ need not address S.S.R. 82-59 on remand.

## V.  CONCLUSION AND RECOMMENDATION

In this case, the ALJ did not adequately explain how he accounted for Dr. Qureshi's opinion, and, without further articulation, the Court cannot accurately determine whether substantial evidence supports the ALJ's opinion.   For this reason, this Court RECOMMENDS that Plaintiff's Motion for Summary Judgment (Dkt. 9) be GRANTED IN PART, that Defendant's Motion for Summary Judgment (Dkt. 13) be DENIED, and that, pursuant to 42 U.S.C. § 405(g), the decision of the Commissioner of Social Security be REMANDED.

On remand, the ALJ is to provide a proper analysis of Dr. Qureshi's opinion, including Dr. Qureshi's sitting, standing, and walking limitations, and then, if necessary, reevaluate Plaintiff's credibility.  Depending on the ALJ's analysis of Dr. Qureshi's opinion, a new residual functional capacity assessment and additional vocational expert testimony may also be necessary.

## VI.  FILING OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1).

Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596 (6th Cir. 2006); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *McClanahan v. Comm'r Soc. Sec.*, 474 F.3d 830 (6th Cir. 2006) (internal quotation marks omitted); *Frontier*, 454 F.3d at 596-97. Objections are to be filed through the Case Management/Electronic Case Filing (CM/ECF) system or, if an appropriate exception applies, through the Clerk's Office. *See* E.D. Mich. LR 5.1. A copy of any objections is to be served upon this magistrate judge but this does not constitute filing. *See* E.D. Mich. LR 72.1(d)(2). Once an objection is filed, a response is due within fourteen (14) days of service, and a reply brief may be filed within seven (7) days of service of the response. E.D. Mich. LR 72.1(d)(3), (4).

s/Laurie J. Michelson
LAURIE J. MICHELSON
UNITED STATES MAGISTRATE JUDGE

Dated: December 26, 2012

CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing document was served on the attorneys and/or parties of record by electronic means or U.S. Mail on December 26, 2012.

s/Jane Johnson
Deputy Clerk

28